THE STATE OF LOUISIANA

VERSUS

STEVEN R TATE AKA "BUBBA"

NO. 22-KA-570

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-7077, DIVISION "D"
HONORABLE SCOTT U. SCHLEGEL, JUDGE PRESIDING


June 21, 2023


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and John J. Molaison, Jr.


<u>**CONVICTION AND SENTENCE AFFIRMED;**</u>
<u>**REMANDED WITH INSTRUCTIONS**</u>
 **FHW**
 **SMC**
 **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Monique D. Nolan
    Joshua K. Vanderhooft
    Brittany Beckner

COUNSEL FOR DEFENDANT/APPELLANT,
STEVEN R. TATE, JR.
    Prentice L. White

**WICKER, J.**

Defendant Steven R. Tate, Jr. a/k/a "Bubba," ("Mr. Tate"), seeks appellate review of his conviction and sentence, claiming the evidence is insufficient to support his conviction of second degree murder and that the trial court erred in admitting evidence of other crimes. On appellate review, we find the evidence is sufficient to support Mr. Tate's conviction for second degree murder and find no error in the trial court's admission of other crimes evidence. Nevertheless, we find the record reveals errors patent, one of which requires remand to the trial court to correct an error appearing in the sentencing minute entry and the uniform commitment order ("UCO"). Therefore, for the following reasons, we affirm Mr. Tate's conviction and sentence and remand the matter for the limited purpose of correcting the sentencing minute entry and commitment order as set forth in this opinion.

## *PROCEDURAL HISTORY AND FACTUAL BACKGROUND*

On March 30, 2017, a grand jury returned an indictment charging Mr. Tate with the second degree murder of Ethan Allen, in violation of La. R.S. 14:30.1, and conspiracy to commit armed robbery with L.L. a/k/a "Chico," and "A.L.," and other persons, in violation of La. R.S. 14:26:64. Before trial, the State filed under seal a notice of intent to use other crimes evidence pursuant to La. C.E. 404(B), which the trial court granted following a hearing on the notice in February 2020. A jury trial in this matter commenced on August 8, 2022. The following facts were elicited at trial:

On November 29, 2016, Mr. Tate and his childhood friend L.L. were together at L.L.'s grandmother's house playing video games. L.L.'s grandmother and his two teenage-sisters, A.L. and T.L., were also present in the home that day. Mr. Tate considered L.L. and his younger sisters like family. While playing video games, a decision was made to purchase marijuana from Ethan Allen ("Mr. Allen"), a local

drug dealer and the victim in this case. Text messages presented at trial demonstrated that Mr. Allen and A.L. had a dealer and customer relationship based on the purchase of drugs. A text message sent from A.L.'s phone was sent requesting a "$10 bag" from Mr. Allen. Mr. Allen was given an address to meet, which was located across the street from L.L.'s grandmother's house. Mr. Tate, testifying in his own defense, admitted that he also texted Mr. Allen the same meeting address.

When Mr. Allen arrived at the agreed upon location, Mr. Tate and L.L. approached Mr. Allen's vehicle. Mr. Tate testified that he did not contact Mr. Allen about the purchase of marijuana. Mr. Tate explained that it was not his intent to purchase drugs from Mr. Allen, but instead to talk to Mr. Allen about the "relationship" Mr. Allen had with L.L.'s younger sister, A.L. Mr. Tate testified that he did not know Mr. Allen but knew that he was an adult and that Mr. Allen was "messing with [A.L.]," whom Mr. Tate stated was 14 or 15 at the time. Mr. Tate testified that he was told that Mr. Allen was coming over to bring A.L. money. Mr. Tate stated that although A.L. was secretive about the transaction, T.L. told him about it. Mr. Tate testified that he was curious to meet Mr. Allen and that he "wanted to him know how old [A.L.] was and see who he was." Mr. Tate told T.L. to let Mr. Allen know that he (Mr. Tate) would come out to Mr. Allen's car to get the money for A.L. Mr. Allen then called Mr. Tate directly. Mr. Tate explained that he told Mr. Allen to go to the address across the street from A.L.'s house because it was the address that T.L. had previously given to Mr. Allen.

Mr. Tate testified that when Mr. Allen arrived, he (Mr. Tate) was already outside with L.L., waiting on someone to pick him up. Mr. Tate admitted that at that time, he was armed with a .45 caliber Springfield Armory gun in his waistband and that L.L. also had a gun. Mr. Tate explained that when Mr. Allen pulled up to the curb, he walked to Mr. Allen's car, opened the passenger door, and stood in the doorway.

According to Mr. Tate, Mr. Allen tried to hand him money, but he told him, "Just hold it. I just want to talk to you right quick." Mr. Tate asked if he was A.L.'s boyfriend, and Mr. Allen stated that he was not. Mr. Tate questioned why Mr. Allen would be bringing her money, and Mr. Allen asked why he was interested in knowing. Mr. Tate told the jury that he explained to Mr. Allen that he was "like a big brother to [A.L.] and she's only 15," and that he hoped they were not having sex. Mr. Tate indicated that the previously calm interaction grew heated.

Mr. Tate testified that he then told Mr. Allen, "[D]on't put up on her no more [sic] and she don't need no [sic] money from you." According to Mr. Tate, Mr. Allen replied, "What, you gonna [sic] stop me" and pulled out a gun and placed it in his lap, facing towards Mr. Tate. Mr. Tate told the jury that he then began backing up and reaching for his own gun. Mr. Tate testified that Mr. Allen fired two shots, and Mr. Tate realized that he had been shot and began returning fire. Mr. Tate testified that he fired two shots and then he was shot again. Mr. Tate testified that he was shot six times and that it felt like Mr. Allen was trying to kill him. Mr. Tate stated that he then ran under the carport and threw his gun in the grass. He then told L.L. to call the police and an ambulance before passing out.

Mr. Tate denied setting Mr. Allen up for a robbery and stated there was no drug transaction. Mr. Tate admitted that he shot and killed Mr. Allen, but said he did so in self-defense.

Kremly Marrero testified at trial that on November 29, 2016, he lived at 803 Gulf Drive. At around 6:00 or 6:30 p.m., he and his wife heard gunshots. He described it as two shots followed by a slight pause and then an array of shots. Mr. Marrero testified that he walked outside at the same time as his neighbor, who lived at 801 Gulf Drive. Mr. Marrero testified that he saw a vehicle "coasting" down towards the end of the street. Mr. Marrero stated that he saw Mr. Tate under the carport where L.L. and his grandmother lived. L.L. was screaming hysterically, and

Mr. Marrero went to help Mr. Tate, whom Mr. Marrero described as "bleeding out everywhere." Mr. Marrero assisted Mr. Tate until the police and EMS arrived.

Debra Lowry testified that she is the grandmother of L.L., A.L., and T.L. She described Mr. Tate as her grandson L.L.'s friend. She said that Mr. Tate was like a brother to L.L. and his two sisters. On November 29, 2016, Ms. Lowry was inside her house at 812 Gulf Drive with A.L. and T.L. when a shooting occurred. Mrs. Lowry testified that she heard what she believed to be firecrackers. Then L.L. ran inside the house, and Mrs. Lowry went outside where she found Mr. Tate, lying on her front porch bleeding. Mrs. Lowry testified that she "tried to call 911, but [she] was really nervous." She stated that she believed she called 911 and when she realized that the police were on their way, she told her granddaughters to dispose of their marijuana. Thereafter, Mrs. Lowry accompanied L.L. to the police bureau where he provided a statement. While at the police bureau, L.L. used his grandmother's phone to text his sister T.L., and as a result, Mrs. Lowry's phone was taken. Mrs. Lowry confirmed that her grandson L.L. was arrested for the shooting and was ultimately convicted.

The State also called as witnesses several investigating officers with the Gretna Police Department involved in this case as well as several expert witnesses.

Officer Corey Boudreaux testified that he was dispatched to the scene. Upon arrival, he came upon a man in the street waving his arms, who told him that a man, later identified as Mr. Allen, had been shot and was located in a vehicle. The officer stopped and observed Mr. Allen, who had a bundle of money and a cell phone in his lap and who was gasping for breath. Officer Boudreaux removed Mr. Allen from the vehicle and began performing CPR until EMS arrived. Mr. Allen, however, died on the scene. Testimony elicited at trial established that Mr. Allen had been shot in his side, and that the shot had gone through multiple organs.

Officer Boudreaux testified, upon inspecting the vehicle, they located a projectile in the driver's seat, three casings in the rear of the vehicle, and one casing outside the vehicle. A .40 caliber Smith and Wesson firearm was located in the vehicle and seized. Officer Boudreaux saw no marijuana, other drugs, or any drug paraphernalia in the vehicle. Mr. Allen's vehicle was seized pursuant to a search warrant and seven cartridge casings, two projectiles, and .40 caliber Smith and Wesson firearm were recovered from inside the vehicle.

Officer Kevin Fernandez, a crime scene technician with the Gretna Police Department, testified that Mr. Allen's vehicle was processed and described the projectile damage inside the car. He testified that the vehicle had a hole from a projectile in the front passenger door as well as holes from projectiles on the roof of the vehicle. Two bullet holes were found in the rain guard, which the officer explained is the plastic shield that goes over the car window. Officer Fernandez stated there was also damage to the interior car door from another projectile.

Officer Damond Bartlett responded to the scene at 812 Gulf Drive. Upon his arrival, he observed several people in front of the residence screaming that someone had been shot. He was directed to the carport, where he observed Mr. Tate lying on the ground suffering from multiple gunshot wounds to the torso. He located shell casing projectiles in front of the residence and observed shattered glass on the street. EMS arrived, and Mr. Tate was transported to the hospital. Officer Bartlett testified that he did not find marijuana or drug paraphernalia while canvasing the scene.

Officer Fernandez also testified that he photographed the scene at 812 Gulf Drive. At trial, he identified several photographs of the scene, including pictures of the home: the carport and the rear exterior of the residence, as well as the interior of the home. He testified that a loaded 9 millimeter caliber Sig Sauer pistol was recovered from the top of a shed. A .45 caliber Springfield Armory pistol was recovered in the backyard. Both firearms were seized.

Detective Ralph Dunn testified that he collected video surveillance from a residence in the area of the 800 block of Gulf Drive and from a building where Mr. Allen's vehicle had come to a stop. Detective Dunn testified that the video depicted Mr. Allen's vehicle going off the road.

A search warrant for Mr. Allen's vehicle was obtained and an iPhone was seized from the vehicle. Officer Ashton Gibbs testified that the data retrieved from the iPhone evidenced a series of text messages and phone calls to and from two particular numbers directing Mr. Allen to Gulf Drive. One of those numbers was associated with Mr. Tate, and the other number was associated with A.L. Officer Gibbs testified that the nature of the text messages indicated that a drug deal was being set up.

Lieutenant Brandon Leblanc, formerly with the Gretna Police Department, testified that he was involved in the investigation of the November 29, 2016 homicide, during which he reviewed phone records. On November 29, 2016, between 5:30 p.m. and 5:58 p.m., four calls were placed between Mr. Allen and Mr. Tate. Lieutenant Leblanc also testified that L.L. and A.L. were involved in getting Mr. Allen to the scene that evening. Lieutenant Leblanc stated that there were text messages pertaining to L.L. robbing Mr. Allen; however, there was nothing from Mr. Tate's phone related to robbing Mr. Allen. Lieutenant Leblanc further testified that Mr. Allen, who was 22, and A.L., who was 15, had an ongoing relationship which involved A.L.'s purchasing of marijuana from Mr. Allen.

Lieutenant Solomon Burke, an expert in mobile device forensics, performed data extractions on the mobile devices connected to the investigation. Lieutenant Burke indicated that no texts between A.L. and Mr. Allen contained the word "sex" and that only two texts contained the word "baby." Lieutenant Burke's testimony corroborated Lieutenant Leblanc's testimony regarding the exchange of phone calls between Mr. Allen's phone and Mr. Tate's phone, indicating that there were two

calls each way and a text to Mr. Allen's phone containing the address 805 Gulf Drive. At 5:44 p.m. on the day in question, Mr. Allen received a phone call. He then made a call at 5:46 p.m., and received another call at 5:58 p.m. There was an outgoing call at 6:07 p.m. to Mr. Tate that lasted four seconds. Mr. Allen's phone made a 911 call at 6:09 p.m.

Dr. Dana Troxclair, a forensic pathologist, with the Jefferson Parish Coroner's Office, conducted an autopsy of Mr. Allen. She testified that she found a gunshot wound to the back of Mr. Allen's armpit and an exit wound to his left upper back. Dr. Troxclair testified that the entry wound was consistent with Mr. Allen's arm not being fully stretched out. Dr. Troxclair testified that Mr. Allen bled out as a result of the gunshot wound.

Linda Tran, an expert in firearms and tool mark examination, issued a scientific analysis report in this case. She testified that she examined a Springfield Armory pistol and determined that two .45 caliber cartridges had been fired from that gun. Additionally, eight cartridge casings and a copper jacketed projectile were determined to have been fired from a .40 caliber Smith and Wesson pistol.

Dr. Tim Scanlan, a crime scene reconstructionist, testified that three .45 caliber fired cartridge casings were recovered, which matched a .45 caliber Springfield weapon. Dr. Scanlan testified that he was present when Mr. Allen's vehicle was processed and analyzed pursuant to a search warrant. He stated that two projectiles and seven casings were recovered from the interior of Mr. Allen's vehicle, and one casing was recovered outside the vehicle under Mr. Allen's body. Dr. Scanlan testified that on inspection, Mr. Allen's vehicle had five bullet holes and one bullet strike mark. He explained that based on the holes and markings, he was able to determine that one of the bullet holes that went through the car door evidenced that the door was open at the time the shot was fired. Additionally, Dr. Scanlan testified that he determined that two bullet holes found in the ceiling showed

metal pointing in the direction of travel, "buckling outward" and therefore was evidence that the shots originated from inside the car. He further stated that the angle of fire was going upward from the passenger side to the driver's side of the vehicle. From this information, Dr. Scanlan testified that he concluded that based on the trajectory of the shots, they originated from the front driver's seat area. He explained that "the angle of fire would be upward straight through the roof." Additionally, Dr. Scanlan testified that two other shots originated from inside the vehicle based on the bullet holes. Dr. Scanlan also explained that a bullet strike showed that there was another bullet fired from inside the vehicle "facing back toward that…front driver's seat and striking" before "falling down and coming to rest." Moreover, Dr. Scanlan testified that a projectile that came to rest in the front passenger-side door had been fired from the .40 caliber Smith and Wesson firearm recovered from the rear passenger floorboard of the vehicle.

Dr. Scanlan testified that the ballistic evidence was consistent with an individual standing outside Mr. Allen's vehicle and firing into the open door. He described the evidence as consistent with "focused fire" and showed a stationary shooter. By comparison, Dr. Scanlan testified that the weapon fired by the driver of the vehicle was "sporadic unfocused fire" as evidenced by the strike mark, the broken window, bullet holes in the rain guard, and bullet holes in the ceiling. He agreed that the evidence was consistent with the shooter of the .45 caliber Springfield Armory shooting two focused shots into the vehicle, and then Mr. Allen returning fire in a "sporadic fashion." He further indicated that it "makes sense" for a wounded Mr. Allen to drop the .40 caliber Smith and Wesson on the rear floorboard. He testified that the trajectory put the "shooter [outside the vehicle]," close to the vehicle or a couple feet away.

The State also presented the following other crimes evidence at trial. In April 2015, Detective Jean Lincoln and Sergeant Justin Remes with the Jefferson Parish

Sheriff's Office were involved in an investigation regarding the shooting of Rogelio Polledo at the Belle Meade apartment complex. Both indicated that it was an attempted armed robbery.

Sergeant Remes explained that the victim sustained a gunshot wound to the leg while inside his vehicle. The victim was transported to the hospital prior to Detective Lincoln's arrival. Upon Detective Lincoln's arrival on the scene, he observed a bloody passenger seat with three bullet holes in it. Two bullet casings were found inside the vehicle, and one was found outside the vehicle. Marijuana with blood on it was also located inside the vehicle.

The victim identified the suspect from a photographic lineup. An arrest warrant for Mr. Tate for attempted armed robbery and shooting was obtained, and Mr. Tate was subsequently arrested. While initially the victim had been cooperative with the investigation, after his cell phone was held for processing, the victim became uncooperative. Detective Lincoln agreed that it is very common for "victims of drug rips" to be uncooperative. The case surrounding the April 2015 incident was ultimately dismissed due to the victim's refusal to cooperate in the prosecution of the matter. At trial, Mr. Tate acknowledged that he had been arrested and charged with attempted robbery in 2015 and that the case had been dismissed. Mr. Tate denied knowing anyone named "Rogelio or Roger Polledo" or being involved in an attempted robbery involving a shooting in Belle Meade in 2015. Mr. Tate further testified that he was prepared to go to trial in that case and prove his innocence.

At the conclusion of trial on August 10, 2022, the twelve-person jury unanimously found Mr. Tate guilty of second degree murder and not guilty of conspiracy to commit armed robbery. On August 23, 2022, Mr. Tate filed a motion for new trial and a motion for post-verdict judgment of acquittal. The trial court denied the motions following a hearing on August 29, 2022. The trial court then sentenced Mr. Tate to life imprisonment at hard labor without the benefit of parole,

probation, or suspension of sentence. On September 2, 2022, Mr. Tate filed a motion for appeal, which the trial court granted on September 9, 2022. Mr. Tate files this timely appeal, challenging the sufficiency of the evidence and the admission of other crimes evidence.

## *DISCUSSION*

In his first assignment of error, Mr. Tate argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that the killing of Mr. Allen was not in self-defense. In reviewing the sufficiency of the evidence, an appellate court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. The appellate court must defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. Under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require this Court to determine whether the evidence at the trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1103. Additionally, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Burnham*, 16-468 (La. App. 5 Cir. 2/8/17), 213 So.3d 470, 474, *writ denied*, 17-664 (La. 4/6/18), 240 So.3d 184. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *McKinney*, 304 So.3d at 1103.

Furthermore, evidence may be either direct or circumstantial. Circumstantial

evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that assuming every fact to be proved that the evidence tends to prove, "in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Becnel*, 17-591 (La. App. 5 Cir. 6/27/18), 250 So.3d 1207, 1225 (quoting *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208). This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.* All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id.* When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence which was erroneously admitted, to determine whether the evidence is sufficient to support the conviction.[1] *See State v. Hearold*, 603 So.2d 731, 734 (La. 1992). *See also State v. Griffin*, 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 483.

In this case, Mr. Tate was convicted of the second degree murder of Mr. Allen, in violation of La. R.S. 14:30, which defines the killing of a human being:

> (A)( 1) When the offender has a specific intent to kill or inflict great bodily harm; or
>
> (2) When the offender is engaged in the perpetration or attempted perpetration of an armed robbery, even though he has no intent to kill or to inflict great bodily harm.

Mr. Tate does not challenge the statutory elements of the charged crime or his

---

[1] Mr. Tate also assigns as error the trial court's admission of other crimes evidence. When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court first considers the sufficiency of the evidence. *Hearold*, *supra.*

identification as the perpetrator.[2]  Mr. Tate admits that he shot and killed Mr. Allen; however, he insists that he acted in self-defense.  When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.  *State v. Batiste*, 16-321 (La. App. 5 Cir. 12/14/16), 208 So.3d 1028, 1033, *writ denied*, 17-300 (La. 11/17/17), 229 So.3d 929.  A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."  La. R.S. 14:20(A)(1).  The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct.  La. R.S. 14:18; *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 106, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897.

The person who is the aggressor or who brings on a difficulty cannot claim self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict.  La. R.S. 14:21.  In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger.  *State v. Martin*, 20-141 (La. App. 5 Cir. 4/28/21), 347 So.3d 1061, 1068, *writ denied*, 21-803 (La. 10/1/21), 324 So.3d 1054.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's

---

[2] This Court need not address the sufficiency of the evidence as it relates to the statutory elements of second degree murder.  *See State v. Henry*, 13-558 (La. App. 5 Cir. 3/26/14), 138 So.3d 700, 715. *See also, State v. Ramirez*, 09-350 (La. App. 5 Cir. 12/29/09), 30 So.3d 833, 840 ("Defendant does not argue that the State failed to establish any of the essential statutory elements of her conviction but only contends that the State failed to prove beyond a reasonable doubt her identity as the offender. Therefore, the sufficiency of the evidence with respect to the statutory elements of second degree murder is not addressed").

knowledge of the assailant's bad character. *State v. Leach*, 22-194 (La. App. 5 Cir. 12/28/22), 356 So.3d 531, 544. The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. *State v. Sinceno*, 12-118 (La. App. 5 Cir. 7/31/12), 99 So.3d 712, 720, *writ denied sub nom. State ex rel. Sinceno v. State*, 12-2024 (La. 1/25/13), 105 So.3d 713. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. *State v. Griffin*, 14-450 (La. App. 5 Cir. 12/16/14), 167 So.3d 31, 38, *writ denied*, 15-148 (La. 11/20/15), 180 So.3d 315.

Here, evidence presented at trial established that on November 29, 2016, Mr. Tate was in communication with Mr. Allen, and plans were made for Mr. Allen to go to 805 Gulf Drive, the address Mr. Tate had provided Mr. Allen. That evening, when Mr. Allen arrived at 805 Gulf Drive, Mr. Tate testified that he was already outside and admitted that he was carrying a .45 caliber Springfield Armory pistol in his waistband. Mr. Tate testified that he had no intention of using the gun he had on his person and that he simply wanted to talk to Mr. Allen about his relationship with A.L. Mr. Tate stated that the conversation between he and Mr. Allen grew heated after he confronted Mr. Allen about the nature of his relationship with A.L. Mr. Tate testified that Mr. Allen questioned what Mr. Tate intended to do about it and placed his gun in his lap. At that point, Mr. Tate stated that he began to back away. Mr. Tate testified that Mr. Allen fired his gun first, and then he returned fire out of fear that he would be killed. In this case, there was no evidence other than Mr. Tate's own testimony to support his claim of self-defense.[3]

---

[3] Mr. Tate's co-defendant, L.L., was tried separately and found guilty of second degree murder on March 23, 2022. L.L. was called to testify in Mr. Tate's trial, but refused to do so and was held in contempt of court and sentenced to six months in the parish prison to run consecutive with any and all other sentences he may be serving.

Ms. Tran, a firearm and tool mark examination expert, testified that two .45 caliber cartridge casings were fired from the Springfield Armory pistol. Additionally, crime scene reconstructionist, Dr. Scanlan, testified that the three .45 caliber-fired cartridge casings that were recovered at the crime scene matched the .45 caliber Springfield Armory pistol. Dr. Scanlan further testified that the ballistics evidence was consistent "focused fired" from a stationary shooter standing outside the vehicle with the vehicle door open when shots were fired. By contrast, Dr. Scanlan testified that the bullet damage to Mr. Allen's vehicle was consistent with the driver of the vehicle firing "sporadic unfocused fire" from Mr. Allen's .40 caliber Smith and Wesson. He further agreed that the ballistics evidence in this case was consistent with two focused shots fired into Mr. Allen's vehicle, and then Mr. Allen returning fire in a sporadic fashion. Dr. Scanlan's opinion, in this regard, corroborates Mr. Marrero's testimony at trial that he heard two gunshots followed by a slight pause and then an array of shots.

The testimony and ballistic evidence the State presented in this case supports a finding that Mr. Tate fired at Mr. Allen first, who then returned erratic fire. This finding is further supported by the testimony of forensic pathologist Dr. Troxclair, who performed the autopsy of Mr. Allen. Dr. Troxclair testified that Mr. Allen suffered a gunshot wound to the back of his armpit and an exit wound to the left upper back, causing damage to multiple organs. Dr. Troxclair indicated that Mr. Allen bled to death as a result of the gunshot wound. He further opined that the entry wound was consistent with Mr. Allen's arm not being fully extended. Dr. Troxclair explained that Mr. Allen's skin was folded over at the site of the entry wound, which was indicative of the fact that Mr. Allen's arm was down when he was shot.

Evidence also established that Mr. Allen fired his .40 caliber Smith and Wesson gun from inside his vehicle. Eight cartridges and a copper-jacketed projectile were fired from the .40 caliber Smith and Wesson pistol. A projectile that

came to rest in the front passenger door was fired from the .40 caliber Smith and Wesson firearm. Based on the number of shots fired from Mr. Allen's weapon, the jury could have reasonably concluded that the evidence was consistent with sporadic, unfocused fire, which would also be consistent with Mr. Tate's injuries that showed he suffered six gunshot wounds; whereas, Mr. Allen suffered one fatal gunshot wound from focused fire from a few feet away.

The jury in this case was presented with conflicting versions of events surrounding the November 29, 2016 shooting. Despite Mr. Tate's testimony that he acted in self-defense, the evidence presented in this case demonstrates that the jury was faced with making a credibility determination, and concluded that Mr. Tate's testimony lacked credibility. The testimony and evidence demonstrated that Mr. Tate shot Mr. Allen while he was sitting in his vehicle with his right arm down, which conflicts with Mr. Tate's assertion that he believed his life was in imminent danger and that deadly forced was necessary when he shot and killed Mr. Allen. Based on the record and the evidence presented in this case, a rational jury could find that the State proved beyond a reasonable doubt that Mr. Tate did not act in self-defense. Therefore, we find no merit to this assignment of error.

### OTHER CRIMES EVIDENCE

In his second assignment of error, Mr. Tate contends that the trial court improperly allowed the State to present at trial other crimes evidence pursuant to La. C.E. art. 404(B). Mr. Tate alleges that his conviction should be reversed because the conviction is based upon improper use of a prior incident that occurred in April 2015.

"The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past." *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09), 28 So. 3d 357, 363,

*writ denied*, 2009-2565 (La. 5/7/10), 34 So. 3d 860.  Evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055; *See also State v. Prieur*, 277 So.2d 126, 128 (La. 1973).  Although the State may not present other crimes evidence to show a defendant's bad character, "evidence of prior crimes may be admitted if the State establishes an independent relevance aside from proving the defendant's criminal character." *State v. Brown*, 17-348 (La. App. 5 Cir. 12/20/17), 235 So.3d 1314, 1323, *writ denied*, 18-158 (La. 11/5/18), 256 So.3d 276, *cert. denied*, 139 S.Ct. 2033, 204 L.Ed.2d 233 (2019).  Other crimes evidence "is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, formerly referred to as *res gestae*, that constitutes an integral part of the act or transaction that is the subject of the present proceeding." *State v. Joseph*, 16-349 (La. App. 5 Cir. 12/14/16), 208 So.3d 1036, 1046, *writ denied*, 17-0077 (La. 4/7/17), 218 So.3d 109 (citing La. C.E. art. 404(B)(1)).  Thus, "[s]uch evidence is not admissible unless it tends to prove a material fact at issue or to rebut defendant's defense" *Id.* at 1324.  In other words, "[t]he probative value of the evidence must outweigh its prejudicial effect of unfair prejudice." *State v. Hardy*, 14-1569 (La. 11/21/14), 154 So.3d 537, 538 (citing La. C.E. art. 403).  Additionally, the State must present sufficient evidence to support a finding that the defendant committed the prior acts.  *State v. Daniel*, 182 So.3d 21, 22 (La. 7/8/15).

"Logically, it falls to the trial court in its gatekeeping function to determine the independent relevancy of such evidence and balance its probative value against its prejudicial effect." *State v. Garcia*, 2009-1578 (La. 11/16/12), 108 So.3d 1, 39.  Consequently, this Court will not disturb the trial court's ruling on the admissibility of other crimes evidence absent an abuse of discretion.  *Id.* at 55.  Furthermore, "the

22-KA-570                                          16

erroneous admission of other crimes evidence has long been held subject to harmless error review." *Id.* (citing La.C.Cr.P. art. 921). In determining harmless error, it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 29, *writ denied sub nom. State ex rel. Massey v. State*, 12-993 (La. 9/21/12), 98 So.3d 332.

The State filed under seal its notice to use other crimes evidence pursuant to La. C.E. art. 404(B), which sought to introduce at trial evidence that Mr. Tate previously committed an attempted armed robbery and aggravated battery on April 20, 2015. The State alleged that during the prior incident, Mr. Tate arranged to purchase marijuana from the victim, and when Mr. Tate entered the victim's vehicle, Mr. Tate attempted to rob the victim of cash and marijuana before shooting him. At the hearing on the State's notice, the State argued that the case *sub judice* involved Mr. Tate luring Mr. Allen to a house under the pretext of buying marijuana from him and that Mr. Tate started to commit an armed robbery but ultimately murdered Mr. Allen. The State alleged that in the April 2015 incident, Mr. Tate, who was a juvenile at the time, was investigated and arrested for similar conduct. The State asserted that the evidence of the April 2015 incident was relevant because it showed *modus operandi*, guilty knowledge, intent, and motive.

Opposing the admission of the April 2015 incident, defense counsel argued that the incidents were factually dissimilar and that there were no facts to suggest that the instant case involving Mr. Allen was an intended "drug deal gone bad." Additionally, defense counsel posited that because the 2015 matter was dismissed, there was no corroborating evidence to support the inference that Mr. Tate was the assailant in the April 2015 incident.

The trial court found the April 2015 incident admissible at trial. The trial

court explained its reasoning as follows: "While it appears it is not a setup drug rip, it is similar in the sense that Mr. Tate used a firearm to rob an individual of property that belonged to the other individual and shot the individual while in the car." It further reasoned that a dismissal does not equate to an acquittal and that there are many reasons why a charge might be dismissed. It also concluded that the exceptions of intent, *modus operandi*, and the absence of mistake could be applicable in this case and that "the probative value is far outweighed by any prejudicial effect."

The defendant bears the burden of showing that he was prejudiced by the admission of the other crimes evidence. *State v. Garcie*, 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279, 1285.

As evidenced by the hearing, the State sought to introduce evidence of Mr. Tate's arrest and involvement in the April 2015 incident, arguing that it was relevant to show Mr. Tate's motive, intent, system, absence of mistake, and in particular to rebut Mr. Tate's self-defense claim. Mr. Tate's 2015 arrest for attempted armed robbery and aggravated battery of the victim, who he allegedly lured to a spot for a drug transaction and then tried to rob, has many similarities to the instant offense. The State presented evidence that Mr. Tate lured Mr. Allen to 805 Gulf Drive under the pretext of a drug deal. Mr. Allen was ultimately shot and found inside his vehicle with a bundle of money in his lap. Based on the foregoing, we cannot say that the trial court abused its discretion in allowing the admission of evidence relating to the April 2015 incident and arrest of Mr. Tate for attempted armed robbery and aggravated battery.

Even if this Court were to find that the other crimes evidence was improperly admitted, which we do not, the error is harmless. As previously discussed, Mr. Tate testified that he shot Mr. Allen, who died as a result. While Mr. Tate asserted that the shooting was in self-defense, the jury found otherwise. The evidence indicates that Mr. Tate texted Mr. Allen where to meet him, and Mr. Tate approached Mr.

Allen with a gun on his person. The testimony and evidence supported a finding that defendant fired his gun first and that Mr. Allen fired back after he was shot. Additionally, the trial judge provided the jury with an instruction on the limited purpose for which it could consider the other crimes evidence. Therefore, the verdict was surely unattributable to admission of the evidence related to the April 2015 incident. For these reasons, this assignment of error lacks merit.

## *ERRORS PATENT*

Finally, this Court routinely, reviews the record for errors patent in accordance with La C.Cr.P. art. 920. *See State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). Review of the record reveals two errors patent. First, a discrepancy exists between the minute entry, uniform commitment order (UCO), and the sentencing transcript. The sentencing minute entry and UCO reflect that Mr. Tate's sentence shall run concurrently with any and all other sentences Mr. Tate is currently serving. However, the sentencing transcript does not indicate that the trial court ordered Mr. Tate's sentence to run concurrently with any other sentence he may be serving. It is well-settled that where there is inconsistency between the minute entry and the transcript, the transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983). Therefore, to ensure accuracy in the record, we remand this matter to the trial court for correction of the minute entry and UCO to delete the provision relating to the concurrent nature of Mr. Tate's sentence. Additionally, the Clerk of Court for the 24th Judicial District is ordered to transmit the original of the corrected UCO to the officer in charge of the institution to which Mr. Tate has been sentenced as well as the Department of Corrections' legal department. *See Burnham*, 213 So.3d at 477 (remanding the matter for correction of the UCO when it stated the sentence was to be served concurrently but was not reflected in the sentencing transcript or minute entry).

Additionally, the sentencing minute entry and transcript demonstrate that the

trial court failed to advise Mr. Tate of the prescriptive period to seek post-conviction relief pursuant to La. C.Cr.P. art. 930.8. If the trial court fails to advise, or provides an incomplete advisal, under La. C.Cr.P. art. 930.8, the appellate court may correct the error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008. Therefore, we hereby advise Mr. Tate that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## *DECREE*

Based on the foregoing reasons, we find the evidence sufficient to support Mr. Tate's conviction and life sentence for the second degree murder of Ethan Allen, and find no error in the trial court's admission of evidence pursuant to La C.E. art. 404(B). Accordingly, Mr. Tate's conviction and sentence is affirmed. The matter is remanded for the limited purpose of correcting the sentencing minute entry and commitment order as set forth above.

**CONVICTION AND SENTENCE AFFIRMED;
REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JUNE 21, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-570**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. SCOTT U. SCHLEGEL (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)          MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

### MAILED
PRENTICE L. WHITE (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                        (APPELLEE)
LOUISIANA APPELLATE PROJECT            DISTRICT ATTORNEY
POST OFFICE BOX 74385                  JOSHUA K. VANDERHOOFT (APPELLEE)
BATON ROUGE, LA 70874                  BRITTANY BECKNER (APPELLEE)
                                       ASSISTANT DISTRICT ATTORNEYS
                                       TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053